UNITED STATES of America,
Plaintiff-Appellant,

v.

William Allan JONES,
Defendant-Appellee.

No. 76–1189.

United States Court of Appeals,
Sixth Circuit.

Argued June 23, 1976.

Decided Sept. 30, 1976.
Rehearing and Rehearing En Banc Denied
Dec. 2, 1976.

662

John L. Bowers, Jr., U. S. Atty., Chattanooga, Tenn., W. Thomas Dillard, Hugh J. Moore, Jr., Ray H. Ledford, Chattanooga, Tenn., for plaintiff-appellant.

H. H. Gearinger, H. H. Gearinger and Associates, Chattanooga, Tenn., for defendant-appellee.

Befo.。 CELEBREZZE, LIVELY and EN-GEL, Circuit Judges.

CELEBREZZE, Circuit Judge.

This is an appeal by the Government from the dismissal of an indictment against William Allan Jones which charged him with intercepting telephone conversations of his estranged wife and using the contents of the intercepted communications in violation of 18 U.S.C. §§ 2511(1)(a) and (d) (1970).[1] Relying principally on the decision of the Fifth Circuit in *Simpson v. Simpson,* 490 F.2d 803 (5th Cir. 1974), the District Court held that Title III of the Omnibus Crime Control and Safe Streets Act of 1968 was not intended to reach interspousal wiretaps placed on telephones in the marital home. On appeal the Government argues 1.) that the District Court followed improper procedures in dismissing the indictment before trial, and 2.) that there is no statutory exception for interspousal wiretaps.

Prior to arraignment, Appellee filed a number of motions with the District Court including a motion for a bill of particulars and a motion to dismiss the indictment for failure to state an offense. At the arraignment before District Judge Frank W. Wilson, Appellee argued that his case fell within an implied statutory exception for interspousal wiretaps and offered to submit affidavits and exhibits. Appellee also offered to withdraw his request for a bill of particulars if the Government would stipulate to the ownership of the house where the tapped telephone was located and the name of the person to whom the telephone was registered. The District Judge granted the motion for a bill of particulars although he stated that the parties could file stipulations in lieu of the bill if they so agreed. He denied Appellee's motion to dismiss the indictment without prejudice indicating that the motion could be renewed at a later date on the basis of the bill of particulars and the affidavit.

In the bill of particulars the Government stated that the residence was owned by the grandmother of Appellee; that the telephone number was listed in Appellee's name; that Appellee and his wife separated in July of. 1974 and had not lived together as man and wife after that date; that Appellee filed for divorce on September 25, 1974; that on October 7, 1974 his wife was granted a restraining order by the Chancery Court prohibiting Appellee from "coming about" her; that on January 20, 1975 the divorce decree was granted; and that on one or more occasions Appellee had intercepted his wife's telephone conversations outside the curtilage of the residence. Appellee submitted an affidavit with exhibits attached wherein he stated that he paid the rent on the premises and the telephone bills during the period in question; that he and his wife continued a sexual relationship even though he had moved out of the house in late July of 1974; that he returned to the house on occasion to babysit; that on October 18, 1974 while babysitting he became suspicious that his wife was involved in an extramarital affair and placed a recording device on the telephone; that the recordings of the intercepted telephone calls confirmed his suspicions; and that he used the recordings to obtain a divorce. On December 3, 1975, District Judge Bailey Brown, sitting by designation, ruled on the basis of the proffered materials that Appellee's conduct fell within an implied exception to 18 U.S.C. § 2511(1)(a) for purely interspousal wiretaps placed on telephones within the

marital home and he dismissed all counts of the indictment.[2]

■■■ The Government contends that the District Court erroneously considered factual allegations in the bill of particulars and Appellee's affidavit in ruling on the motion to dismiss. They cite a number of older cases which hold that a court may not look beyond the face of an indictment in ruling on a motion to dismiss. *See Las Vegas Merchant Plumbers Ass'n v. United States*, 210 F.2d 732, 741 (9th Cir. 1954); *United States v. Westbrook*, 114 F.Supp. 192, 199 (W.D.Ark.1953); *United States v. Quinn*, 116 F.Supp. 802, 803 (E.D.N.Y.1953). The Government also charges that it was error to order it to submit a bill of particulars when the indictment was sufficient on its face to apprise Appellee of the charges against him. *See United States v. Perez*, 489 F.2d 51, 71 (5th Cir. 1973); *United States v. Marks*, 364 F.Supp. 1022, 1030 (E.D.Ky.1973).

Rule 12 of the Federal Rules of Criminal Procedure, as recently amended,[3] states:

> **(b)** Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion.

> \*     \*     \*     \*     \*     \*

> **(e)** A motion made before trial shall be determined before trial unless the court, for good cause, orders that it be deferred for determination at the trial of the general issue or until after verdict, but no such determination shall be deferred if a party's right to appeal is adversely affected. Where factual issues are involved in determining a motion, the court shall state its essential findings on the record.

The rule was written to encourage the making of motions prior to trial. *See* Notes of the Advisory Committee to the 1975 Amendments to Fed.R.Crim.P. 12, *reprinted in* 8 J. Moore, Federal Practice ¶ 12.01[3] at 12–7, 8 (2d ed. 1976) (hereinafter Moore). District courts are directed to dispose of all motions before trial if they are capable of determination without trial of the general issue.[4] Fed.R.Crim.P. 12(b). Generally, motions are capable of determination before trial if they raise questions of law rather than fact. *See United States v. Miller*, 491 F.2d 638, 647 (5th Cir. 1974). However, Rules 12(e) and (g) clearly envision that a district court may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motion so long as the court's findings on the motion do not invade the province of the ultimate finder of fact.[5] *See* Moore ¶ 12.04

---

2. Judge Brown concluded that dismissal of the count under 18 U.S.C. § 2511(1)(a) required dismissal of the remaining counts under subsection (d) charging use of information obtained through an illegal interception.

3. The amendments to Rule 12 became effective on December 1, 1975, two days before Judge Brown's ruling.

4. The House Judiciary Committee in its notes on the 1975 amendments to Rule 12(e) declared that district courts should rarely defer ruling on pretrial motions:

> The Committee modified subdivision (e) to permit the court to defer its ruling on a pretrial motion until after the trial only for good cause. Moreover, the court cannot defer its ruling if to do so will adversely affect a party's right to appeal. The Committee believes that the rule proposed by the Supreme Court could deprive the government of its appeal rights under statutes like section 3731 of title 18 of the United States Code. Fur-

> ther, the Committee hopes to discourage the tendency to reserve rulings on pretrial motions until after verdict in the hope that the jury's verdict will make a ruling unnecessary.

H.R.Rep. No. 94–247, 93d Cong., 2d Sess. (1974), *reprinted* 18 U.S.C.A. Fed.R.Crim.P. 12 at 167.

5. Rule 12 prior to the 1975 amendments provided that:

> "[a]n issue of fact shall be tried by a jury if a jury trial is required under the Constitution or an act of Congress. All other issues of fact shall be determined by the court with or without a jury or on affidavits or in such other manner as the court may direct."

The Advisory Committee declared that it was not their intention in deleting this reference to change existing law or practice. *See* Notes of the Advisory Committee to the 1975 Amendment of Rule 12, *reprinted in* 8 Moore ¶ 12.-01[3] at 12–10. *See also id.* ¶ 12.04 at 12–24–26.

at 12–24, 25. Thus, a defense is " 'capable of determination' if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *United States v. Covington*, 395 U.S. 57, 60, 89 S.Ct. 1559, 1561, 23 L.Ed.2d 94 (1969).

The District Court was justified in deciding Appellee's motion to dismiss the indictment before trial, because it raised the legal question of whether 18 U.S.C. § 2511(1)(a) was intended to apply to interspousal wiretaps. His motion was one in bar—for purposes of the motion he admitted the offense, interception of another's wire communication, but argued the existence of a statutory exception for interspousal wiretaps which immunized him from prosecution.[6] *See United States v. Dorneau*, 491

F.2d 473, 478 (2d Cir. 1974). The facts surrounding the alleged offense were virtually undisputed and trial of the substantive charges would not substantially assist the Court in deciding the legal issue raised by the motion to dismiss the indictment. The District Court was not limited to the face of the indictment in ruling on the motion to dismiss. *See e. g., United States v. Seeley*, 301 F.Supp. 811 (D.R.I.1969). Rule 12 vests the Court with authority "to determine issues of fact in such manner as the court deems appropriate." Notes of the Advisory Committee to Fed.R.Crim.P. 12, *reprinted in* 8 Moore ¶ 12.01[3] at 12–8. Appellee in his affidavit did not contradict the essential allegations in the indictment and the bill of particulars so the Court properly considered it in ruling on the motion.[7] *See Fed.R.*

---

**6.** Previously, the Government would have had to take a direct appeal to the Supreme Court under 18 U.S.C. § 3731 from the dismissal of an indictment based on construction of the statute upon which the indictment was founded. Courts of appeals narrowly construed their jurisdiction under the statute to include only dismissals based on obvious defects in the indictment or information, or in the institution of the prosecution. *See e. g., United States v. Apex Distributing Co.*, 270 F.2d 747, 755 (9th Cir. 1959). Government appeals were further limited by the Supreme Court's decision in *United States v. Sisson*, 399 U.S. 267, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970), which held that the dismissal of an indictment operated as an acquittal from which no appeal would lie if the district court considered evidence extrinsic to the indictment in granting the motion.

Out of dissatisfaction with *Sisson* and other judicial precedents interpreting § 3731 to restrict the Government's right of appeal, the Congress revised the section so that now all appeals from orders dismissing indictments are to the courts of appeals. 18 U.S.C. § 3731, *as amended* Pub.L. No. 91–644, 84 Stat. 1890 (1971). In *Serfass v. United States*, 420 U.S. 377, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975), the Supreme Court re-examined the area and held that merely because a district court considers extrinsic evidence in granting a Rule 12 motion to dismiss an indictment does not transform a ruling on a pretrial motion into an acquittal so that appeal is barred by double jeopardy. The Court distinguished the limited role of a district judge in ruling on a pretrial motion to dismiss an indictment and that of the ultimate trier of fact in trial of the general issue, noting that only in the latter instance is a defendant placed in jeopardy. 420 U.S. at 389, 392–93, 95 S.Ct. 1055.

**7.** Rule 47 of the Federal Rules of Criminal Procedure provides that motions may be supported by affidavits. Although the 1975 amendments to Rule 12 deleted specific reference to the use of affidavits, the Advisory Committee indicated that it was not their intention to change existing law. *See* note 5 *supra*. *See also* 8 Moore ¶ 12.04 at 12–26. However, Rule 47 does not sanction the use of "speaking motions":

> The last sentence providing that a motion may be supported by affidavit is not intended to permit 'speaking motions' (e. g. motion to dismiss an indictment for insufficiency supported by affidavits), but to authorize the use of affidavits when affidavits are appropriate to establish a fact (e. g. authority to take a deposition or former jeopardy).

Notes of the Advisory Committee to Federal Rule of Criminal Procedure 47, *reprinted in* 8 Moore ¶ 12.04 at 12–26. Professor Moore cites *United States v. J. R. Watkins Co.*, 16 F.R.D. 229 (D.Minn.1954), as a case which illustrates "[t]he distinction between a defense which may be decided before trial on the basis of affidavits and exhibits, and one which requires a trial of the general issue". 8 Moore ¶ 12.04 at 12–27. In *Watkins* the Court was presented with two separate defenses in a Rule 12 motion to dismiss, one based on the statute of limitations and the other disputing the Government's interpretation of facts alleged in the indictment. The Court disposed of the statute of limitations defense before trial on the basis of affidavits and exhibits but deferred ruling on the other defense because it contradicted the allegations of the indictment and went "to the very foundation of [the] prosecution." 16 F.R.D. at 234. *See* 8 Moore ¶ 12.04 at 12–27–28 & nn. 13, 14. Appellee's affidavit and exhibits were submitted solely to establish a factual basis for ruling on the legal issue raised in his motion.

Crim.P. 47. *See also* 8 Moore ¶ 12.04 at 12–26. The Court also was within its authority in ordering the Government to submit a bill of particulars to supplement the allegations in the indictment so that it could determine whether there was a factual basis for ruling on the motion to dismiss the indictment. *Cf.* 8 Moore ¶ 7.06[2] at 7–35. Under the circumstances, the issue of whether Appellee was exempt from prosecution under 18 U.S.C. § 2511(1)(a) was capable of determination prior to trial and was properly raised by a motion to dismiss the indictment. *See Watson v. United States*, 141 U.S.App.D.C. 335, 439 F.2d 442, 453–54 & n. 11 (1970).

▮ We now turn to the basic contention of Appellee that he was exempt from prosecution under 18 U.S.C. § 2511(1)(a). The language of 18 U.S.C. § 2511(1)(a) and (d) is straightforward and comprehensive:

(1) Except as otherwise specifically provided in this chapter any person who—

(a) willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication;

\* \* \* \* \* \*

(d) willfully uses, or endeavors to use, the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection;

shall be fined not more than $10,000 or imprisoned not more than five years, or both.

As the Supreme Court stated in *United States v. Giordano*, 416 U.S. 505, 514, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974), "[t]he purpose of the legislation . . . was effectively to prohibit . . . all interceptions of oral and wire communications, except those specifically provided for in the Act . . . ." Despite the unam-

biguous language of the statute, the District Court chose to follow the Fifth Circuit's holding in *Simpson v. Simpson*, 490 F.2d 803 (5th Cir. 1974), that this section was not intended to prohibit purely interspousal wiretaps placed on telephones in the marital home. Because we interpret the statute's legislative history differently than did the Court in *Simpson* and because we believe that this case is distinguishable from *Simpson* both legally and factually, we reverse.

*Simpson v. Simpson* was a civil suit under 18 U.S.C. § 2520 (1970),[8] brought by a woman against her former husband. The husband, harboring uncertainties as to his wife's faithfulness, attached a recording device to the telephone lines at their home and recorded conversations between his wife and another man which the Court described as "mildly compromising." 490 F.2d at 804. He used the recordings to obtain an uncontested divorce. *Id.* Although the *Simpson* Court admitted that the "naked language" of Title III was all-inclusive, they concluded that Congress did not intend to intrude into domestic conflicts normally left to state law. *Id.* The *Simpson* Court reviewed the Act's legislative history and based their conclusion on the lack of a positive expression of Congressional intent to include purely interspousal wiretaps within the Act's prohibitions. *Id.* The Court distinguished electronic surveillance by a third-party, which they stated would violate the Act even if instigated by a spouse, because they viewed it as "an offense against a spouse's privacy of a much greater magnitude than is personal surveillance by the other spouse." 490 F.2d at 809. The *Simpson* Court concluded with a caveat:

As should be obvious from the foregoing, we are not without doubts about our decision. However, we have concluded that the statute is not sufficiently definite and specific to create a federal cause of action for the redress of appellant's

---

8. Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall (1) have a civil cause of action against any person who inter-

cepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications.

18 U.S.C. § 2520.

grievances against her former husband. Our decision is, of course, limited to the specific facts of this case. No public official is involved, nor is any private person other than appellee, and the *locus in quo* does not extend beyond the marital home of the parties. 490 F.2d at 810

■■ Ordinarily a court will not refer to legislative history in construing a statute which is clear on its face. *See e. g., United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961). The language of § 2511(1)(a) quite clearly expresses a blanket prohibition on all electronic surveillance except under circumstances specifically enumerated in the statute.[9] *See United States v. Giordano, supra*, 416 U.S. at 514, 94 S.Ct. 1820. The natural presumption when construing a statute is that Congress meant what it said. However, the *Simpson* Court concluded that, despite the literal language of the section, the absence of positive proof of congressional intent to include interspousal wiretaps in the Act's prohibitions indicated that Congress did not intend to reach that activity. 490 F.2d at 805. The District Court in this case adopted *Simpson's* analysis of the statute's legislative history and concluded that, as a matter of law, Appellee was immune from prosecution for intercepting and recording his wife's telephone conversations. This conclusion is untenable because it contradicts both the explicit language of the statute and the clear intent of Congress expressed in the Act's legislative history.

This section was enacted as part of Title III of the Omnibus Crime Control and Safe Streets Act of 1968. Pub.L. No. 90–351 § 802 (June 19, 1968), 1 U.S.Code Cong. & Admin.News 1968, 90th Cong., 2d Sess., at p. 255. Title III was drafted to fill loopholes in the existing law.[10] *See Hearings Before a Subcomm. of the Senate Comm. on the Judiciary*, 90th Cong., 1st Sess., at 4 (1967) (remarks of Sen. Long). The Senate Report on the bill described the problem addressed by Title III:

The tremendous scientific and technological developments that have taken place in the last century have made possible today the widespread use and abuse of electronic surveillance techniques. As a result of these developments, privacy of communication is seriously jeopardized by these techniques of surveillance. Commercial and employer-labor espionage is becoming widespread. It is becoming increasingly difficult to conduct business meetings in private. Trade secrets are betrayed. Labor and management plans are revealed. No longer is it possible, in short, for each man to retreat into his home and be left alone. Every spoken word [relative] to each man's personal, marital, religious, political, or commercial concerns can be intercepted by an unseen auditor and turned against the speaker to the auditor's advantage.

9. None of the express exceptions to 18 U.S.C. § 2511 are applicable to this case.

10. The legislation which became Title III was the product of widespread dissatisfaction with the existing federal statute regulating the interception of wire communications, the Federal Communications Act of 1934, 47 U.S.C. § 605 (1970). Section 605 prohibits the unauthorized publication or use of intercepted communications, but does not prohibit electronic surveillance *per se*. In 1967 the President's Commission on Law Enforcement and Administration of Justice published a report which was highly critical of federal regulation of electronic surveillance. President's Commission on Law Enforcement and the Administration of Justice, Report on the Challenge of Crime in a Free Society, at 202–203 (1967). Appended to the report was a draft statute prepared by Professor G. Robert Blakey of the University of Notre Dame to regulate the interception of wire and oral communications. Title III was an amalgamation of three bills. On January 25, 1967, Senator McClellan introduced a proposed "Federal Wire Interception Act", S. 675, 113 Cong. Rec. 1491. On June 29, 1967, Senator Hruska introduced a proposed "Electronic Surveillance Act of 1967", S 2050, 113 Cong.Rec. 18007, which relied heavily on the recommendations of the President's Crime Commission. Finally, on October 3, 1967, the House version was introduced, H.R. 13275, 113 Cong.Rec. 27718, which was in substance the Blakey bill. Thus, the blanket prohibition against private surveillance suggested by Professor Blakey was incorporated into Title III. See *United States v. Giordano*, 416 U.S. at 517 n. 7, 94 S.Ct. 1820. *See also* 2 U.S.Code Cong. & Admin.News 1968, 90th Cong., 2d Sess., at pp. 2153, 2274.

S.Rep. No. 1097, *reprinted in* U.S.Code Cong. & Admin.News 1968, 90th Cong., 2d Sess., at p. 2154. Although the primary target of the bill was organized crime, the Senate Report makes it clear that the purpose of the bill was to establish an across-the-board prohibition on all unauthorized electronic surveillance:

> Title III has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized. To assure the privacy of oral and wire communications, *title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officers* engaged in the investigation or prevention of spec-

ified types of serious crimes, and only after authorization of a court order obtained after a showing and finding of probable cause.

*Id.* at p. 2153. (Emphasis added).

■■■■ The *Simpson* Court noted that the majority of the legislative history dealt with electronic surveillance by law enforcement officials and found the discussion of private surveillance to be inconclusive on the desired scope of the Act's prohibitions. 490 F.2d at 807. However, the legislative history leaves no doubt that the Act was intended to reach private electronic surveillance [11] and that Congress was aware that a major area of use for surveillance techniques was the preparation of domestic relations cases.[12] Professor Robert Blakey, publicly credited with being the author of

11. The Senate Report declares that Title III created a flat ban on all unauthorized electronic surveillance:

> Title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officials engaged in the investigation of specified types of major crimes after obtaining a court order

. . . . .

S.Rep. No. 1097, *reprinted in* 2 U.S.Code Cong. & Admin.News 1968, 90th Cong., 2d Sess., at p. 2113. *See also id* at pp. 2153, 2156, 2180–81. *See also* note 18 *infra.*

12. Congress held a number of hearings beginning in 1965, as part of a continuous legislative effort to revise federal law on electronic surveillance. This process culminated in the enactment of Title III of the Omnibus Crime Control and Safe Streets Act of 1968. For a list of Congressional hearings on the subject see *Simpson v. Simpson,* 490 F.2d at 807 n. 10.

In 1965, the Subcommittee on Administrative Practice and Procedure of the Senate Judiciary Committee held hearings on the need for legislation to protect the public's privacy against electronic surveillance. *Hearings on Invasions of Privacy Before the Subcomm. on Administrative Practice & Procedure of the Senate Comm. on the Judiciary,* 89th Cong. 1st Sess. (1965–66). Senator Long, the Chairman of the subcommittee, identified three major areas where private electronic surveillance was widespread:

> "The three large areas of snooping in this [non-governmental] field are (1) industrial (2) *divorce cases,* and (3) politics. So far, we have heard no real justification for continuance of snooping in these three areas. If any justification exists, we will probably hear

about it in the next few weeks as we expect to explore this terrain thoroughly."

*Id.* pt. 5 at 2261. (Emphasis added.) Senator Long included an article by Arthur Whitman entitled "Is Big Brother Taping You" in the record of the hearing which stated, in pertinent part, that:

> "Individuals involved in civil suits bug each others' premises to gather useful information and evidence. The prime area for this is divorce actions, particularly in states with restrictive codes. So little is sacred in this line of endeavor that bugs are routinely discovered under the beds of estranged husbands and wives who suspect each other of errant ways. The latest twist in this game is the installation of tiny radio transmitters in cars that relay to prying cars and tape recorders any conversations or other sounds produced by drivers and passengers."

*Id.* part I, at 18. During these hearings the subcommittee heard testimony from Richard Gerstein, District Attorney of Dade County, Florida that:

> it is routine procedure in marital disagreements and other civil disputes for private detective agencies, generally with full knowledge of the lawyers, to tap telephones.

*Id.* part II, at 1009.

The subcommittee also heard testimony from two private investigators, Bernard Spindel and John W. Leon, and the president of a firm which sold electronic surveillance equipment, Ben Jamil, to the effect that electronic surveillance had become a common technique in domestic relations investigations. *Id.* part 5 at 2262 (Spindel); *id.* at 2365 (Jamil); and *id.* at 2411 (Leon).

Title III,[13] testified before the Subcommittee on Administrative Practice and Procedure of the Senate Judiciary Committee that:

> [P]rivate bugging in this country can be divided into two broad categories, commercial espionage and marital litigation.[14]

Congressional awareness that the Act's prohibition of private surveillance would be applicable to domestic relations investigations is reflected in the comments of Senator Hruska, one of the co-sponsors of the bill, which were joined by Senators Dirksen, Scott and Thurmond:

**13.** See *United States v. Giordano*, 416 U.S. at 517–18 n. 7, 94 S.Ct. 1820; *United States v. Hall*, 488 F.2d 193, 197 n. 7 (9th Cir. 1973). *See also* notes 10 and 14.

**14.** *Hearings on The Right to Privacy Act of 1967 Before the Subcomm. on Administrative Practice & Procedure of the Senate Comm. on the Judiciary*, 90th Cong., 1st Sess. pt. 2, at 413 (1967). In his testimony before the subcommittee, Professor Blakey praised the provisions in the Right to Privacy Act of 1967 which prohibited private electronic surveillance:

> The widespread use of electronic surveillance techniques in this country by private hands is an abomination. I can find no justification for their use and thus, I welcome the attempt of the Right of Privacy Act to strike at these practices.

*Id.* at 412. However, he questioned the wisdom of grounding the bill solely on the commerce power. *Id.* at 413. Comparing the two most frequent uses of electronic surveillance by private individuals—commercial espionage and domestic relations investigation—Professor Blakey mentioned a weakness of the Right to Privacy Act which could restrict its effectiveness in curbing private surveillance:

> But this [the interstate character of commercial espionage] is not true in the domestic relations investigation, which involves, moreover, a far more objectionable invasion of privacy [than commercial espionage]. It is, of course, one thing to overhear a business secret; it is a wholly different matter, however, to place under surveillance the marital relationship. Electronic surveillance by a private individual in another's bedroom cuts most sharply against the grain. But few, if any, of these investigations ever touch interstate commerce.

*Id.* at 442. *See also id.* at 413. As an alternative source of legislative authority, Professor Blakey suggested the draft statute he had prepared as a special consultant to the President's Commission on Law Enforcement and Administration of Justice which relied on section 5 of

A broad prohibition is imposed on private use of electronic surveillance, particularly in domestic relations and industrial espionage situations.[15]

Our review of the legislative history of this section, testimony at congressional hearings, and debates on the floor of Congress, inescapably lead to the conclusion that 18 U.S.C. § 2511(1)(a) establishes a broad prohibition on all private electronic surveillance and that a principal area of congressional concern was electronic surveillance for the purposes of marital litigation.[16]

the Fourteenth Amendment to reach electronic surveillance in domestic relations cases. *Id.* at 442. This suggestion was adopted by Congress and incorporated into the Act's legislative history. S.Rep. No. 1097, *reprinted in* 2 U.S.Code Cong. & Admin.News 1968, 90th Cong., 2d Sess., at p. 2180.

**15.** S.Rep. No. 1097, *reprinted in* 2 U.S.Code Cong. & Admin.News 1968, 90th Cong., 2d Sess. at p. 2274.

**16.** A number of Congressmen introduced statements to that effect into the Congressional Record. Senator Thurmond stated that his views on the bill were contained in a joint statement with Senators Hruska, Dirksen and Scott which was included in Senate Report No. 1097. He then introduced that statement—including the portion which indicated that Title III was particularly designed for domestic relations situations—into the Congressional Record. 114 Cong.Rec. 4841. *See* text accompanying note 15 *supra*. Senator Hruska introduced an article by Senator Scott which stated:

> This legislation [Title III] has the following major provisions: 1. Private utilization of wiretapping and bugging would be flatly prohibited.

*Id.* at 1211. Senator Tydings made the following statement:

> Mr. President, as the law stands today, we have the worst of both sides. All of our private eyes, our economic detectives, our snoopers, can tap with impunity anybody's wire, on any action from a domestic relations case to a real estate operator or a major manufacturing concern, while the police cannot. . . . Title III corrects this situation. It makes illegal the indiscriminate tapping of wires. . . .

*Id.* at 6107. Senator McClellan, co-sponsor of Title III, stated that:

> To assure the privacy of oral and wire communications, *title III prohibits all wiretapping and electronic surveillance by per-*

The *Simpson* Court was privy to many of the same materials which were reviewed by this Court. *See* 490 F.2d at 806–809 nn. 8–16. However in *Simpson* their importance was discounted because the Court distinguished between unaided surveillance by a spouse and surveillance involving a third-party, even if instigated by the spouse. 490 F.2d at 809. This distinction has been seized upon in a subsequent case. *See Remington v. Remington*, 393 F.Supp. 898, 901 (E.D.Pa.1975). In our view, it is a classic "distinction without a difference." For purposes of federal wiretap law, it makes no difference whether a wiretap is placed on a telephone by a spouse or by a private detective in the spouse's employ.[17] The end result is the same—the privacy of the unconsenting parties to the intercepted conversation has been invaded. It is important to recognize that it is not just the privacy of the targeted spouse which is being violated, but that of the other party to the conversation as well. *See generally* Comment, *Interspousal Electronic Immunity*, 7 Tol.L. Rev. 185, 209 (1975). Justice Brandeis aptly described the "evil" of wiretapping in his dissenting opinion to *Olmstead v. United States*, 277 U.S. 438, 475–76, 48 S.Ct. 564, 571, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting):

> The evil incident to invasion of the privacy of the telephone is far greater than that involved in tampering with the mails. Whenever a telephone line is tapped, the privacy of the persons at both ends of the line is invaded and all conversations between them upon any subject, and although proper, confidential and privileged, may be overheard. Moreover, the tapping of one man's telephone line involves the tapping of the telephone of every other person whom he may call or who may call him. As a means of espionage, writs of assistance and general warrants are but puny instruments of tyranny and oppression when compared with wire-tapping.

The view expressed by Justice Brandeis in *Olmstead* that there is a constitutional right to privacy in wire communications was later accepted by a majority of the Supreme Court in *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), and in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Title III was drafted to meet the standards enunciated in *Berger* for constitutional electronic surveillance and to conform with *Katz*. *See* 1 U.S.Code Cong. & Admin.News 1968, 90th Cong., 2d Sess., at p. 2153. The implication is clear then that the Congress enacted Title III to protect the privacy of all persons conversing over the telephone and that their privacy is shielded from invasion by third parties and spouses alike.[18]

---

> sons other than duly authorized law enforcement officers . . .
>
> *Id.* at 6095. (Emphasis added.) *See also id.* at 5531 (Sen. Scott); *id.* at 6097 (Sen. Long); *id.* at 4643 (Rep. Machen).

17. Congress defined the offense in 18 U.S.C. § 2511(1)(a) to include "any person who . . . *procures* any other person to intercept or endeavor to intercept, any wire or oral communication . . . ." (Emphasis added.) This suggests that Congress intended to ensnare not only the operative conducting an illegal surveillance but the spouse who hired him as well.

18. This is clearly borne out by the definition of "aggrieved person" in 18 U.S.C. § 2510(11) (1970), which includes not only the person under surveillance but all other non-consenting parties to the intercepted communications:

> (11) "aggrieved person" means a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed.

*See also* 18 U.S.C. § 2520 (1970).

In count two of the indictment, Appellee was charged with revealing the contents of the intercepted telephone conversations to James F. Logan "for the purpose of obtaining a sum of money from said James F. Logan." The Government has thus accused Appellee of using the contents of the intercepted conversation to extort money from one of the parties. In ruling that all counts against Appellee had to be dismissed, the District Court created an incongruous situation where a spouse who was not a party to the communication is absolutely immunized from prosecution under circumstances where the party spouse, if she had made recordings of the conversation for extortion, would lose her qualified immunity under § 2511(2)(d):

> (d) It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire or oral communication where such person is a party to the communication or where one of the parties

As a matter of statutory construction, the conclusion reached in *Simpson* is also questionable. The explicit language of 18 U.S.C. § 2511(1)(a) is that "any person" who violates the section is liable to punishment "except as otherwise specifically provided." If Congress had intended to create another exception to Title III's blanket prohibition of unauthorized wiretaps they would have included a specific exception for interspousal wiretaps in the statute. *Cf. Remington v. Remington*, 393 F.Supp. at 901. As noted previously, Congress was well aware that wiretaps were frequently used to investigate domestic relations cases. We also dispute the implication in *Simpson* that the limited attention given to private electronic surveillance in the legislative history, relative to that afforded surveillance by law enforcement personnel, reflects Congress' equivocation on the scope of Title III in the private sector. The more plausible explanation is that it was the consensus of Congress that there is "no justification" for private electronic surveillance so that debate centered on the more volatile issue of law enforcement surveillance.[19]

This interpretation is consistent with the pervasive theme of Title III that electronic surveillance should be sharply curtailed and in no instance be undertaken without strict judicial authorization and supervision. *See United States v. Giordano*, 416 U.S. at 514, 519 n. 8, 94 S.Ct. 1820; *United States v. Chavez*, 416 U.S. 562, 581, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974) (Douglas, J., concurring).

If there is an interspousal exception to the wiretap act, it would have to be narrowly circumscribed to comport with the intent of Congress in enacting Title III. The *Simpson* Court admitted as much by restricting their decision to its facts. 490 F.2d at 810. Cases subsequent to *Simpson* have cited it for the existence of an interspousal immunity to federal wiretap law, but each court has distinguished *Simpson* on its facts and found that the wiretap in question was illegal. *See United States v. Schrimscher*, 493 F.2d 848, 851 (5th Cir. 1974); *Remington v. Remington*, 393 F.Supp. at 901. *See also Rickenbaker v. Rickenbaker*, 226 S.E.2d 347; at 352 (N.C.S. Ct.1976). *Cf. Markham v. Markham*, 265 So.2d 59 (C.A.Fla. 1st Dist. 1972), *aff'd* 272

---

to the communication has given prior consent to such interception *unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State or for the purpose of committing any other injurious act.* Interception of a wire or oral communication by a party to the conversation for purposes of extortion would violate the conditions of § 2511(2)(d) and expose that person to prosecution under the Act. *See Meredith v. Gavin*, 446 F.2d 794, 799 (8th Cir. 1971). Since Congress clearly intended that parties to intercepted communications have greater leeway under the Act than non-parties, the District Court was in error in ruling that Appellee was immunized from prosecution under § 2511 where he allegedly used the contents of the intercepted conversation to extort money from a non-consenting party.

**19.** The legislative history abounds with expressions of congressional consensus on the lack of justification for private electronic surveillance:

Virtually all concede that the use of wiretapping or electronic surveillance techniques by private unauthorized hands has little justification where communications are intercepted without the consent of one of the participants. No one quarrels with the proposition that the unauthorized use of these techniques by law enforcement agents should be prohibited.

S.Rep. No. 1097, *reprinted in* 2 U.S.Code Cong. & Admin.News 1968, 90th Cong., 2d Sess., at p. 2156. *See also id.* at pp. 2153, 2180–81. Senator Scott echoed the sentiments of the majority:

This Title also prohibits the utilization of wiretapping and bugging by all private persons and by all public officials where there is no compelling law enforcement need as discussed above. In those circumstances, there can be no justification for the use of such techniques.

*Id.* at p. 2264. Senator Percy summarized the virtually unanimous support of the Senate for the unqualified abolition of all private wiretapping and eavesdropping:

Mr. President, the provisions of the bill [Title III] banning private surveillance enjoy widespread if not complete support of this body.

114 Cong.Rec. 6257. *See generally* Note, 7 Tol.L.Rev. at 203 & n. 82.

So.2d 813 (Fla.S.Ct.1973). *But see Beaber v. Beaber,* 41 Ohio Misc. 95, 322 N.E.2d 910 (C. P. Stark Co. 1974). In *United States v. Schrimsher* the Fifth Circuit declined to apply *Simpson* to a different factual setting. In *Schrimsher* the defendant was a disgruntled lover who hid himself in his former lover's home to monitor her telephone calls. 493 F.2d at 850. The Court held *Simpson* was not controlling because the defendant was not married to the person whose telephone he tapped, he was not part of her household, and he had no legal right to be on the premises. *Id.* at 851. In *Remington v. Remington* the Court distinguished *Simpson* because the defendant had involved third parties in the installation of the wiretap used to record her husband's telephone conversations. 393 F.Supp. at 901. This, the *Remington* Court concluded, constituted a "gross invasion" of privacy which was not excepted from federal wiretap law. *Id.*

Even if *Simpson* was correctly decided on its facts, this case is clearly distinguishable. In *Simpson* the Court was concerned about the scope of the civil remedies under § 2520.[20] The Court stated that Congress had not sought to create "a federal remedy for marital grievances" when it provided civil remedies for aggrieved persons. 490 F.2d at 807 n. 7. The *Simpson* Court based its decision, at least in part, on a desire to avoid a conflict between the civil remedies granted by the federal statute and the doctrine of interspousal immunity from civil action in tort recognized by many states. *Id.* The Court concluded that Congress did not intend to override the doctrine of interspousal immunity and "intrude into the marital relation within the marital home", normally a subject for state law. *Id.* at 807. This analysis is faulty when applied to this case in a number of respects. One problem is that state law is far from uniform on the doctrine of interspousal immunity. A number of states have decided the doctrine is antiquated and have abandoned it.[21] There is also substantial doubt whether a doctrine of state tort law should have any influence in defining a cause of action expressly created by federal statute, particularly when Congress could have included a similar provision in the statute and failed to do so. *See Remington v. Remington,* 393 F.Supp. at 901–02. The most telling difference between this case and *Simpson* however, is that we are here concerned with construing the scope of a criminal statute. Even in states which recognize interspousal immunity, that immunity does not apply to criminal prosecutions.[22] As noted above, Title III protects the privacy of all parties to an intercepted communication, and the fact that one party to a tapped conversation is the spouse of the defendant should have no bearing whatsoever on the availability of criminal penalties.[23]

**20.** *See* note 8 *supra.*

**21.** Thirty states and the District of Columbia still recognize some form of interspousal immunity, but twenty states have rejected the doctrine. *See* Comment, 7 Tol.L.Rev. at 190 n. 27. *See generally id.* at 191–97. The trend appears to be toward abrogation of the doctrine. *See* W. Prosser, Law of Torts § 122 at 863–64 (4th ed. 1971). (Hereinafter Prosser).

**22.** The common law doctrine of interspousal immunity was based on the legal fiction of marital identity—in the eyes of the law, husband and wife were considered one person and that person was the husband. *See* Prosser § 122 at 859. For this reason, it was impossible at common law to maintain a tort action between man and wife. *Id.* at 860. However, husbands and wives were always regarded as separate individuals in criminal law. *Id.* at 859. In fact, as the marital identity theory broke down and other justifications were offered for continuing interspousal immunity in tort, it was often said that a person injured by his spouse could find remedy enough in the criminal and divorce laws. *Id.* at 862.

**23.** There is some suggestion in the Senate Report that civil and criminal liability should be coterminous:

The prohibition, too, must be enforced with all appropriate sanctions. Criminal penalties have their part to play. But other remedies must be afforded the victim of an unlawful invasion of privacy. Provision must be made for civil recourse for damages. The perpetrator must be denied the fruits of his unlawful actions in civil and criminal proceedings. Each of these objectives is sought by the proposed legislation.

S.Rep. No. 1097, *reprinted in* 2 U.S.Code Cong. & Admin.News 1968, 90th Cong., 2d Sess., at p. 2156.

This case is also distinguishable on its facts. In *Simpson* the wiretapping incident took place while the couple were living together as man and wife. Here, it is undisputed that Appellee and his wife were separated at the time of the electronic surveillance. Appellee had moved out of the house in July of 1974 and by October 18th when the surveillance device was installed he was under a restraining order from the Chancery Court to prevent him from "coming about" his wife. Also, in *Simpson* the Court stressed that "the *locus in quo* [of the wiretap] does not extend beyond the marital home of the parties." 490 F.2d at 810. Here, it is doubtful whether there was a "marital home" within the *Simpson* Court's meaning of the term, and the surveillance was conducted from outside the residence where the telephone was located. While we are not convinced that the location of the surveillance device has any relevance in ascertaining the scope of the statute,[24] we mention this only to emphasize that Appellee and his wife were not sharing a domicile at the time of the interception. As in *Schrimsher,* Appellee had no legal right to be on the premises, see 493 F.2d at 851, and, as in *Remington,* the marriage by that time had become one in name more than fact. *See* 393 F.Supp. at 901. Under these circumstances, we do not find applicable the implied interspousal exception to the wiretap statute recognized in *Simpson.*

The District Court did not err in ruling on the motion to dismiss before trial but was in error in dismissing the indictment against Appellee for failure to state an offense. The allegations in the indictment clearly state violations of 18 U.S.C. § 2511(1)(a) and (d), for wrongful interception and use of wire communications. We reach this conclusion reluctantly because we share the concern of other courts which have grappled with this problem that application of federal wiretap law to essentially

domestic conflicts may lead to harsh results in individual cases. However, the plain language of the section and the Act's legislative history compels interpretation of the statute to include interspousal wiretaps. It is not for this Court to question the wisdom of Congress and to establish an implied exception to a federal statute by judicial fiat. Only Congress has the authority to amend 18 U.S.C. § 2511. Accordingly, the judgment of the District Court is reversed and the case is remanded for trial.

---

**24.** We express no opinion on the dictum in *Simpson v. Simpson,* 490 F.2d at 809 & n. 17, that Title III does not reach a family member's interception of a telephone conversation by use of an extension telephone in the family home, other than to note that there is a vast differ-

ence between overhearing someone on an extension and installing an electronic listening device to monitor all incoming and outgoing telephone calls. *See generally* Note, 7 Tol.L. Rev. at 205. *But cf. Rickenbaker v. Rickenbaker, supra* at 5.